CHRISTOPHER FROST (SBN 200336)
chris@frostllp.com
FROST LLP
10960 Wilshire Boulevard, Suite 2100
Los Angeles, California 90024
Telephone: (424) 254-0441
Facsimile: (424) 600-8504

Attorneys for Responding Parties
Raheel Lakhany, Shafaq Sattar,
ST & Company, LLC

RONALD RICHARDS (SBN 176246)
ron@ronaldrichards.com
LAW OFFICES OF RONALD RICHARDS
& ASSOCIATES, A.P.C.
P.O. Box 11480
Beverly Hills, California 90213
Telephone: (310) 556-1001
Facsimile: (310) 277-3325

Attorneys for Defendant
Smoke Tokes, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| AK FUTURES LLC,<br><br>  Plaintiff,<br><br>  v.<br><br>SMOKE TOKES, LLC; and DOES 1-10,<br><br>  Defendants. | Case No. 8:21-cv-01061-JVS-ADS<br><br>*Assigned to Hon. James V. Selna*<br><br>**RESPONDING PARTIES' RAHEEL LAKHANY, SHAFAQ SATTAR, AND ST & COMPANY, LLC'S RESPONSE TO ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION**<br><br>*[Filed concurrently with Declaration of Raheel Lakhany & Evidentiary Objections to Application for Contempt and Declaration of Thomas Frost in Support Thereof]*<br><br>Date:     September 19, 2024<br>Time:     4:00 PM<br>Crtrm.:  10C |

RESPONDING PARTIES' RAHEEL LAKHANY, SHAFAQ SATTAR, AND ST & COMPANY, LLC'S
RESPONSE TO ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

# <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ..................................................................................5

II.    RELEVANT FACTUAL BACKGROUND .........................................6

III.   LEGAL STANDARD FOR ISSUANCE OF PRELIMINARY
       INJUNCTION ....................................................................................8

IV.    ARGUMENT........................................................................................9

       A.   There is No Legal or Factual Basis for Issuance of a Preliminary
            Injunction...................................................................................9

            1.   An Injunction is Improper, as the Contempt Motion Only Seeks
                 Monetary Relief and There is No Risk of Dissipation of Assets..........10

            2.   Plaintiff Cannot Show a Likelihood of Success on the Merits.............11

            3.   The Balance of Equities are Overwhelmingly in Favor of
                 Responding Parties................................................................18

            4.   Granting a Preliminary Injunction in this Circumstance is Against
                 the Public Interest................................................................20

       B.   Alternatively, the Court Should Require Plaintiff to Post a Bond of No
            Less Than $10 Million ................................................................21

V.     CONCLUSION ..................................................................................22

RESPONDING PARTIES' RESPONSE TO ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Abbott Lab'ys v. Sandoz, Inc.*,
   544 F.3d 1341 (Fed. Cir. 2008) ...........................................................19

*Atari Games Corp. v. Nintendo of America, Inc.*,
   897 F.2d 1572 (Fed. Cir. 1990) ...........................................................18

*In re Bennett*,
   298 F.3d 1059 (9th Cir. 2002) ...........................................................13

*California by & through Becerra v. Azar*,
   950 F.3d 1067 (9th Cir. 2020) .............................................................9

*Caribbean Marine Servs. Co. v. Baldrige*,
   844 F.2d 668 (9th Cir. 1988) .............................................................12

*Castillo v. Skoba*,
   No. 10CV1838 BTM, 2011 WL 92991 (S.D.Cal. Jan.7, 2011) .......................22

*Diaz v. Brewer*,
   656 F.3d 1008 (9th Cir. 2011) ...........................................................22

*Disney Enterprises, Inc. v. VidAngel, Inc.*,
   869 F.3d 848 (9th Cir. 2017) ...............................................................9

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*,
   10 F.3d 693 (9th Cir. 1993) ...........................................................13, 17

*Earth Island Inst. v. Carlton*,
   626 F.3d 462 (9th Cir. 2010) ...............................................................9

*Enesco Corp. v. Price/Costco Inc.*,
   146 F.3d 1083 (9th Cir. 1998) ...........................................................18

*Frontera Res. Corp. v. Hope*,
   *No.* 19-CV-01996-RS, 2019 WL 2410513 (N.D. Cal. June 7, 2019) ...............21

*Gerber Plumbing Fixtures, LLC v. Amerifreight, Inc.*,
   No. 2:15-CV-04146-ODW, 2015 WL 3824149 (C.D. Cal. June 18,
   2015) .............................................................................................21

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,
   527 U.S. 308, 333 (1999) ............................................................. 11, 12

*Johnson v. Couturier*,
   572 F.3d 1067 (9th Cir. 2009) ........................................................... 20

*Munaf v. Geren*,
   553 U.S. 674 (2008) ............................................................................ 9

*New England Braiding Co. v. A.W. Chesterton Co.*,
   970 F.2d 878 (Fed. Cir. 1992) ........................................................... 19

*Peterson v. Highland Music, Inc.*,
   140 F.3d 1313 (9th Cir. 1998) ........................................................... 13

*Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*,
   53 F.3d 1073 (9th Cir. 1995) ............................................................. 18

*Shell Offshore Inc. v. Greenpeace, Inc.*,
   815 F.3d 623 (9th Cir. 2016) ............................................................. 13

*Stormans, Inc. v. Selecky*,
   586 F.3d 1109 (9th Cir. 2009) ........................................................... 21

*Ware v. Bayview Loan Servicing, LLC*
   2013 WL 5308303 (S.D. Cal., Sept. 18, 2013, No. 13-CV-1310 JLS
   NLS) .................................................................................................. 22

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ........................................................................... 9, 21

*Wolfard Glassblowing Co. v. Vanbragt*,
   118 F.3d 1320 (9th Cir. 1997) ........................................................... 13

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
   395 U.S. 100 (1969) .......................................................................... 23

**Other Authorities**

Fed.R.Civ.P. 65(c) ...................................................................... 22, 23

Local Rule 83-2.2.2 .......................................................................... 8

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Through this Opposition, responding parties Raheel Lakhany ("Lakhany"), Shafaq Sattar ("Sattar")[1], and ST & Company, LLC ("ST") (collectively, "Responding Parties") challenge plaintiff AK Futures LLC's ("Plaintiff" or "AKF") request for a preliminary injunction seeking to freeze their assets. Plaintiff's request is predicated on speculative allegations that fail to substantiate the drastic, extraordinary, and unwarranted relief they seek. The core of Plaintiff's argument hinges on a fictional or overstated risk of asset dissipation without substantive proof linking this risk to the actions or intentions of Responding Parties. Indeed, Plaintiff's allegations fail to specifically detail any acts by Responding Parties that would constitute a legitimate and immediate threat justifying the drastic measure of freezing their assets. Moreover, the request encompasses assets that are both unrelated to the alleged legal transgressions and essential for the ongoing lawful business operations of Responding Parties, thus vastly overreaching in scope and impact.

Now, Plaintiff's attempt to freeze Responding Parties' assets under dubious pretenses crosses the line into harassment as it seeks to leverage the power of this Court and its resources to unduly pressure Responding Parties without legitimate grounds. Indeed, Plaintiff's—and its counsel's—harassing pattern of behavior is evident in the absurdly broad scope of the requested injunction and in the persistence of Plaintiff's actions, despite lacking any concrete evidence that would warrant such severe judicial intervention. As such, it is essential for the Court to recognize these maneuvers as what they are: strategic litigation aimed at harassing Responding Parties to extract additional concessions and disrupt their lawful business operations.

---

[1] Plaintiff's Contempt Application (ECF No. 105) and other filings erroneously refer to "Shahid Jumani a/k/a Shaffaq Sattar." Shahid Jumani and Sattar are two distinct individuals, and Shafaq Sattar is the 50% percent owner of the Smoke Tokes enterprise alongside Lakhany. Plaintiff's misidentification undermines the accuracy of its allegations and calls into question the diligence of its fact-finding process.

By denying Plaintiff's requested preliminary injunction, the Court will send a clear message that the judicial process cannot, and should not, be used a tool for harassment and that substantial, credible evidence is required before such extraordinary relief can be granted. Accordingly, this Court should deny Plaintiff's request for a preliminary injunction as there is no justifiable basis for the sweeping measures it seeks and no credible risk of dissipation of funds. Defendants have no intention of concealing or dissipating assets in contravention of the Court's order, and Plaintiff's requested injunction calls into question the motives behind its contentions to the Court.

## II.    **RELEVANT FACTUAL BACKGROUND**

Plaintiff filed an Application for an Order to Show Cause Re: Contempt and For Sanctions on July 26, 2024 (ECF No. 105), with a supporting Declaration filed by Plaintiff's counsel, Mr. Thomas Frost (ECF No. 105-1), and 45 exhibits attached thereto (ECF Nos. 105-2–105-46). This Application accused Smoke Tokes, LLC and Responding Parties of continuing to infringe on the "Cake" trademarks and purportedly selling counterfeit products, despite being enjoined by a Permanent Injunction. Merely days later, on July 29, 2024, Plaintiff filed a Motion for Attorneys' Fees demanding compensation for post-judgment costs purportedly incurred while enforcing the Court's orders. (ECF No. 106.)

On August 2, 2024, the Court issued an Order to Show Cause Re: Contempt mandating that Smoke Tokes and the Responding Parties appear on August 19, 2024, to address the contempt allegations. (ECF No. 107.) Amid these filings, on August 7, 2024, Kutak Rock LLP, the then-representatives of Smoke Tokes, filed an *Ex Parte* Motion to Withdraw as Counsel citing a termination of coverage for the instant litigation by the client's insurer, State Farm.[2] (ECF No. 108.) The Court approved this

---

[2] Plaintiff's persistent attempts to mischaracterize facts to this Court are not well-taken. Responding Parties did not "force" their attorneys to withdraw, as Plaintiffs

Motion on August 8, 2024, leaving Smoke Tokes without legal representation. (ECF No. 109.) As a result, the Court vacated both hearings[3] to allow Smoke Tokes the necessary time to comply with the Court's instruction to secure substitute legal representation. In doing so, the Court acknowledged that as a limited liability company, Smoke Tokes could not represent itself in court proceedings according to Local Rule 83-2.2.2 and longstanding legal precedent mandating that corporations and similar entities must appear through licensed counsel. (ECF No. 111.)

Recognizing Smoke Tokes' vulnerable position without legal representation, Plaintiff and its counsel strategically filed an *Ex Parte* Application for a Temporary Restraining Order ("TRO") against Smoke Tokes and related parties on August 28, 2024, aiming to freeze assets and accounts under the pretext of preventing the purported dissipation of funds—thus exploiting the transition period before new counsel could effectively take charge. (ECF No. 114.) The following day, August 29, 2024, the Court issued the TRO and scheduled an Order to Show Cause hearing for September 12, 2024, to determine whether the TRO should be converted into a Preliminary Injunction. (ECF No. 118.)

On September 6, 2024, at 7:43 PM—two hours after Responding Parties' opposition to the TRO Application would have been due—Plaintiff's counsel served the Court's Order granting the TRO upon Responding Parties via email. Upon receipt, Responding Parties immediately retained the undersigned counsel, who then reached out to Plaintiff's counsel and requested a meeting to discuss the substance of the TRO and for Responding Parties' personal bank accounts to be released from the scope of

---

claim. Rather, State Farm declined to provide coverage for defense and/or indemnity to Smoke Tokes, LLC or ST & Company, LLC for this matter. Declaration of Raheel Lakhany ("Lakhany Decl.") ¶ 2.

[3] This included the Order to Show Cause Re: Contempt hearing scheduled for August 19, 2024, and the hearing on Plaintiff's Motion for Attorneys' Fees on August 26, 2024.

the TRO. Plaintiff's counsel refused to engage with newly retained counsel until 12:43 AM on September 9, 2024. Later that morning, counsel for the parties met-and-conferred, but were unable to resolve the issues pertaining to the substance of the TRO; however, an agreement was reached to extend the briefing schedule and OSC hearing date by one week. During this meeting, counsel for Responding Parties suggested that Responding Parties could post a $50,000 bond to allay Plaintiff's concerns about any risk of dissipation of funds. In response, Plaintiff's counsel suggested an exorbitant $500,000 bond, which Responding Parties declined.

## III.   LEGAL STANDARD FOR ISSUANCE OF PRELIMINARY INJUNCTION

"A preliminary injunction is an 'extraordinary and drastic remedy.'" *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008). Indeed, a preliminary injunction, as an extraordinary remedy, "may only be awarded upon a clear showing that the plaintiff is entitled to such relief," and is "never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 24 (2008). Thus, "plaintiffs seeking a preliminary injunction face a difficult task in proving that they are entitled to this 'extraordinary remedy.'" *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010). "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S. at 24.

To obtain a preliminary injunction, the moving party must demonstrate that "(1) it is 'likely to succeed on the merits,' (2) it is 'likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'the balance of equities tips in [its] favor,' and (4) 'an injunction is in the public interest.'" *Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017). "The first factor—likelihood of success on the merits—'is the most important' factor." *California by & through Becerra v. Azar*, 950 F.3d 1067, 1083 (9th Cir. 2020). "If a movant fails to establish likelihood of success on the merits, [courts] need not consider the other factors." *Id.*

IV.    **ARGUMENT**

A.    **There is No Legal or Factual Basis for Issuance of a Preliminary Injunction**

Plaintiff's Application for a preliminary injunction lacks credible legal or factual basis. First, the alleged risk of asset dissipation is unsupported by any concrete evidence. As briefed to the Court in Responding Parties' *Ex Parte* Application (ECF No. 125), the asserted basis for the TRO is unsupported by concrete evidence, making the drastic measure of an asset freeze both unnecessary and inappropriate. (ECF No. 125, 6:10–7:14.) For instance, Plaintiff's contention of counterfeiting activity is demonstrably unfounded. Specifically, Plaintiff inaccurately claims that Responding Parties engage in counterfeit sales involving the "Cake" mark, citing activities of ***wholly unrelated*** entities in Texas with ***no connection*** to Responding Parties. Moreover, Plaintiff's allegations about illicit financial transfers to and from China grossly misrepresent the nature of legitimate business transactions that Responding Parties conduct as part of their routine operations in the smoking product industry. These transactions are standard commercial activities, *not* schemes to dissipate assets as Plaintiff claims. Additionally, Plaintiff's use of the WeChat communications as purported evidence of clandestine activities misunderstands the platform's commonplace use among suppliers and businesses, particularly in Asia, to conduct regular commerce. Instead, Plaintiff inexplicably depicts this standard communication technology as a tool for concealing purportedly illegal activity. Plaintiff further misrepresents the narrative with respect to Responding Parties' purported restructuring and sharing of assets among commonly owned entities. As explained in the *Ex Parte* Application seeking a modification of the TRO (ECF No. 125), ST Imports LLC and Stokes Distribution LLC are legitimately operated entities that serve distinct business purposes; however, Plaintiff falsely portrays these entities

/ / /

/ / /

as mechanisms for asset dissipation.[4] Instead, these entities were formed to facilitate importing and producing smoking products.

In sum, Responding Parties have clearly articulated—in both their submissions to this Court and in discussions with Plaintiff's counsel—that there exists no appreciable risk of asset dissipation that would justify an asset freeze, thus negating any need for a preliminary injunction. Indeed, during a meet-and-confer session on September 9, 2024, Responding Parties' counsel proposed posting a $50,000 bond as a good faith measure to alleviate any concerns Plaintiff might have regarding asset dissipation, which Plaintiff's counsel refused. Accordingly, Plaintiff cannot demonstrate any factual or legal basis to justify the issuance of preliminary injunction, and therefore, the request should be denied.

### 1. An Injunction is Improper, as the Contempt Motion Only Seeks Monetary Relief and There is No Risk of Dissipation of Assets

A preliminary injunction authorizing an asset freeze is improvidently granted if it converts what is essentially a legal monetary claim to fungible funds into an "equitable" remedy. Under *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, a court does not have the authority in an action at law brought by a private plaintiff to freeze assets to preserve them for potential money damages. 527 U.S. 308, 333 (1999). Here, Plaintiff seeks to freeze the assets of Responding Parties solely to preserve funds for potential future monetary damages, which is explicitly barred by *Grupo Mexicano*. Plaintiff's motion is nothing more than an attempt to circumvent the ordinary legal process and improperly obtain an equitable remedy where no such equitable interest exists. There is no justifiable basis for the claim that Responding

---

[4] Plaintiff references ST Distro LLC and Sigma Labs LLC, both of which were organized prior to the instant litigation, as referenced in Plaintiff's moving papers. (ECF No. 114 at 7). Neither of these entities present a risk of dissipation of assets, as ST Distro is a wholesale distributor with over 5,000 SKUs as inventory, and Sigma Labs is a suspended entity that does not maintain a bank account. Lakhany Decl. ¶ 3.

Parties are attempting to hide, transfer, or dissipate assets in violation of the Court's order or any equitable interest; thus, the extraordinary relief of freezing assets is unwarranted. Indeed, Plaintiff's speculative assertions that Responding Parties may dissipate assets are insufficient to support an asset freeze. "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (citing *Goldie's Bookstore, Inc. v. Superior Ct. of State of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984)). Here, Plaintiff's and its counsel's conclusory contentions about the possibility of asset dissipation, without concrete evidence of fraudulent conduct or deliberate actions to undermine the permanent injunction, is insufficient to justify the extraordinary remedy of an asset freeze. Plaintiff has failed to present any concrete evidence demonstrating either conduct or an intent by Responding Parties to dissipate or hide assets. In fact, Responding Parties have openly communicated with Plaintiff's counsel, offering to post a $50,000 bond as a good faith measure to alleviate any concerns of asset dissipation. Plaintiff's refusal to accept this reasonable bond offer is evidence of the lack of real risk or urgency justifying the drastic measure of an asset freeze.

Given the absence of any equitable claims or demonstrated risk of asset dissipation, the asset freeze requested by Plaintiff is inappropriate and should be denied in accordance with the Supreme Court's decision in *Grupo Mexicano*. Plaintiff's request for a preliminary injunction is predicated entirely on speculative assertions and unsupported allegations of risk, which are insufficient to warrant such an extraordinary remedy.

## 2. Plaintiff Cannot Show a Likelihood of Success on the Merits

### (a) Plaintiff Cannot Satisfy the Legal Standard to Demonstrate Contempt

"A court may wield its civil contempt powers for two separate and independent purposes: (1) 'to coerce the defendant into compliance with the court's order'; and (2)

'to compensate the complainant for losses sustained.'" *Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 629 (9th Cir. 2016).

To succeed on a motion seeking a finding of civil contempt, the moving party must "show by clear and convincing evidence that [the alleged contemnor] violated [an injunction] beyond substantial compliance, and that the violation was not based on a good faith and reasonable interpretation of the judgment." *Wolfard Glassblowing Co. v. Vanbragt*, 118 F.3d 1320, 1322 (9th Cir. 1997). Thus, a "moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court. The burden then shifts to the contemnors to demonstrate why they were unable to comply." *In re Bennett*, 298 F.3d 1059, 1069 (9th Cir. 2002). However, "a person should not be held in contempt if his action appears to be based on a good faith and reasonable interpretation of the [court's order]." *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993) (internal quotations omitted). As illustrated below, Plaintiff cannot show, by clear and convincing evidence, that Responding Parties violated the terms of the Permanent Injunction, as all of Plaintiff's purported facts and contentions are easily refuted in light of their blatant inaccuracy, falsity, and mischaracterization. Nonetheless, Responding Parties acted in good faith and complied with the Court's order to the best of their understanding, as supported by documented evidence and legitimate business practices.

**(b)      Plaintiff's Purported Evidence for the Contempt**

**Application is Incorrect, Misleading, or Manufactured**

"[A] district court ordinarily should not impose contempt sanctions solely on the basis of affidavits." *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1324 (9th Cir. 1998) (citing *Hoffman et al. v. Beer Drivers & Salesmen's,* 536 F.2d 1268, 1276–77 (9th Cir.1976)). Nonetheless, here, the evidence cited in Plaintiff's Contempt Application is fundamentally flawed and easily controverted. For instance, Plaintiff's allegations concerning the purported purchase of counterfeit 25 counterfeit "Cake"-

branded products and two counterfeit "Cake"-branded "Lookah" devices on August 11, 2021 (ECF No. 105 at 9, ¶ 1), are demonstrably false. All "Cake"-branded products sold by Smoke Tokes, including the delta-8 disposables, were authentic and purchased directly from AK Futures LLC, which are substantiated by purchase invoices *and* communications from AKF's principals. Lakhany Decl. ¶¶ 4–6, Exs. 1–3. The Contempt Application also makes the conclusory claim that the products are counterfeit and cites to an exhibit of a purported investigative report, but nothing in the report mentions that the products are counterfeits. (*See* ECF No. 105-6.) Furthermore, the "Cake"-branded "Lookah Seahorse Pro" devices were authorized for production by the AKF and Lookah, with Smoke Tokes serving as the intermediary during the production process. This arrangement was explicitly sanctioned by AKF's principles, Peter Amato and James M. Clelland, as detailed in the package design provided by and sent to Lakhany. *Id.* ¶ 5–6, Ex. 2, 3. Indeed, extensive WhatsApp communications between Amato, Clelland, and Lakhany substantiate that this project was authorized and approved by AKF. *Id.*

Moreover, the allegations that attempt to link Smoke Tokes to the unauthorized activities of "eight Smoke Tokes SA distributorships in San Antonio, Texas" (ECF No. 105 at 9, ¶ 2) are highly misleading. The "Smoke Tokes SA" distributor in Texas is a completely unrelated entity to Smoke Tokes in Los Angeles, ST, or any other entity owned by Responding Parties, with different owners and no corporate or management overlap. Lakhany Decl. ¶ 8. In fact, "Smoke Tokes SA" and ST have competing trademark registrations for the "Smoke Tokes" mark pending with the U.S. Patent and Trademark Office. *Id.* ¶ 9, Ex. 4. Thus, any illicit or unauthorized acts by any Texas-based distributor of smoking products cannot be attributed to Responding Parties.

Plaintiff's claim regarding a purported invoice issued to Yatin Enterprises totaling evidence of counterfeit sales is mischaracterized. (ECF No. 105 at 10, ¶ 3.) The invoice in question in fact represents a *return* of products from Yatin Enterprises

to ST, not a sale, as evidenced by the "Total Credit - $45105.25" and "-45,105.25" notations on the last page of the cited invoice. (ECF No. 105-9 at 4.) Similarly, Plaintiff's interpretation of a WhatsApp conversation about delivering counterfeit "Cake"-branded Lookah devices is entirely false, as the discussion was about *returning* products to the manufacturer, not about selling or distributing counterfeit items. Lakhany Decl. ¶ 10, Ex. 5.

Further, Plaintiff's claims that Smoke Tokes marketed inauthentic "Cake" products on its website, Twitter, and in B2B Wholesaler Magazine are baseless and unsupported. (ECF No. 105 at 10, ¶¶ 6, 7.) As explained extensively herein, Smoke Tokes and Responding Parties exclusively sold authentic and sanctioned "Cake"-branded products, and the "Cake"-branded Lookah design was authorized and produced by Cake's principals. Lakhany Decl. ¶¶ 5-6, Exs. 1, 3. Plaintiff's claim that Responding Parties engaged a co-packer to produce inauthentic "Cake" products is a pure fabrication. (ECF No. 105 at 10, ¶ 8.) The cited text message chain consists of a single introductory message stating "Raheel smoke tokes" and shows no subsequent interaction or discussion about co-packing services for "Cake"-branded products. (*See* ECF No. 105-14.)

Plaintiff's depiction of a purchase order from Alpha Distro as evidence of sales and distribution of counterfeit products is grossly mischaracterized and contains several inaccuracies. (ECF Nos. 105 at 10–11, ¶ 9; 105-37.) Specifically, ST did not sell "Cake"-branded products to Alpha Distro; the entity in question is actually Elite Distributors LLC, based in Orlando, Florida. The cited transaction was not a sale but a *refund* to Elite for returned products, totaling -$647.50, contrary to the claimed amount of $856,000 in sales. The document reflects a return merchandise authorization for damaged goods previously received from ST. Furthermore, the pricing data has been misrepresented; the amounts listed per unit have been erroneously treated as large sums due to a misunderstanding of the inventory system, where a display of five disposables were treated as one unit rather than five individual

pieces. To illustrate, the first entry on the document indicates Item # 10521, described as "CAKE D8 XL DISPOSABLE **5CT** AK-47," with the quantity received as "-0.40," meaning that two of the five units were to be returned. The pricing per display, listed at "$87.500"—this particular inventory system using a three-decimal-point system—equates to $17.50 per piece, thus amounting to the "Ext Cost" return amount of "-$35.00" for two units. When applied to each entry on the document, this system of calculation shows a total of ***$647.50 in returns, as opposed to $856,000 in sales*** as deceptively posited by Plaintiff and its counsel. Lakhany Decl. ¶ 16, Ex. 10.

Additionally, Plaintiff mispresents the transactions on September 4 and 16, 2021. (ECF No. 105 at 11, ¶¶ 10, 11.) On September 4, the alleged confirmation of selling inauthentic "Cake"-branded products was actually an internal inventory check between Lakhany and an ST employee, incorrectly stated to involve 199 distributors and falsely claimed to be on WeChat, when it was on WhatsApp. (*See* ECF No. 105-16.) Similarly, on September 16, what Plaintiff describes as new shipments worth $12,555 were actually returns from Bootlegger Extracts LLC due to damaged goods, with credits totaling -$2,489.00 issued back to Bootlegger, *not sales*. (*See* ECF No. 105-17; Lakhany Decl. ¶ 11, Ex. 6.) These misrepresentations are typical of Plaintiff's attempts to misconstrue the nature of the transactions to fit its narrative of counterfeit sales.

Similarly, further allegations regarding transactions in late 2021 are unsubstantiated and misleading. On September 25, Plaintiff incorrectly claims that Lakhany arranged to purchase 10,000 units of counterfeit Cake disposables from a Chinese supplier, Vapeall. (ECF No. 105 at 11, ¶ 12.) However, Lakhany was inquiring about different products—namely "Packwoods," not Cake—and no purchases were made as a result of these communications. Lakhany Decl. ¶ 12, Ex. 7. Moreover, the claim that Lakhany engaged in continuous interactions with Abby Chen for the purchase of counterfeit products is equally baseless. (ECF No. 105 at 11, ¶ 13.) The communications—allegedly on WeChat, but actually on WhatsApp—did

not pertain to any transactions but were typical solicitations received by distributors. There were no engagements or purchases from Vapeall or Ms. Chen related to counterfeit Cake products. Lakhany Decl. ¶ 13, Ex. 8. Even in the referenced exhibit, there is not one communication from Lakhany to Ms. Chen. (ECF No. 105-19.)

In the interest of brevity, and upon a fuller briefing on the Contempt Application, Responding Parties will refute each and every mischaracterized, misleading, or blatantly false allegation of violation purported by Plaintiff and its counsel. However, to further demonstrate that Plaintiff is *not* likely to succeed on the underlying Contempt Application, Responding Parties *again* reiterate that they never sold any counterfeit Cake products. Lakhany Decl. ¶ 14. Plaintiff's claim that its investigators observed and purchased counterfeit products at the Smoke Tokes Superstore on July 7, 2022, is entirely false. (ECF No. 105 at 12, ¶ 18.) ST only carried legitimate Cake products at that time, having purchased them through American Distribution, the sole authorized distributor of Cake, and Responding Parties have invoices that substantiate these legitimate purchases. Lakhany Decl. ¶ 15, Ex. 9. Furthermore, Smoke Tokes is a distributor, not a retailer, and does not sell products at retail pricing as claimed by Plaintiff. *Id.* Instead, Plaintiff inflates the alleged damages by referencing retail pricing rather than wholesale figures, which is wholly misleading, as is its characterization of the ST warehouse at 401 E. 2nd Street as the "Smoke Tokes Superstore."

Even if this were considered a violation of the Court's Permanent Injunction— which Responding Parties contend it is not—any such violation would have occurred in good faith, as Responding Parties reasonably believed they were permitted to *purchase* legitimate Cake products from authorized sources and their prior counsel had not advised otherwise. *Id.*; *see also In re Dual-Deck*, 10 F.3d at 695 ("a person should not be held in contempt if his action appears to be based on a good faith and reasonable interpretation of the [court's order]." (internal quotations omitted)). Even so, Responding Parties' acquisition of *genuine* Cake products from an authorized

distributor would be protected under the first sale doctrine. *Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073, 1074 (9th Cir. 1995) ("courts have consistently held that, with certain well-defined exceptions, the right of a producer to control distribution of its trademarked product does not extend beyond the first sale of the product."). *Enesco Corp. v. Price/Costco Inc.*, 146 F.3d 1083, 1085 (9th Cir. 1998) ("Under the doctrine, resale by the first purchaser of the original article under the producer's trademark is generally neither trademark infringement nor unfair competition.").

Based on the identified inaccuracies and misstatements of fact, Plaintiff cannot demonstrate a likelihood of success on the merits of the Contempt Application. The evidence provided by Plaintiff is easily controverted and fundamentally flawed, as demonstrated herein. Upon fuller briefing, Responding Parties will thoroughly dismantle each and every allegation. For now, Plaintiff's failure to meet the clear and convincing standard, coupled with the mischaracterization of critical facts, warrants the denial of the requested preliminary injunction.

### (c)    Plaintiff's Contempt Application Relies on Inadmissible Evidence

Thomas Frost's Declaration introduces new evidence, including forty-five exhibits, on which Plaintiff has improperly relied to attempt to backdoor an injunction against non-parties. There is no exceptional circumstance justifying Plaintiff's attempt to introduce evidence without foundation or authentication. As argued in the Motion to Strike and Objections to the Declaration of Thomas Frost ("Thomas Frost Declaration"), filed concurrently herewith, the Court should strike the Thomas Frost Declaration and attached exhibits in its entirety, as well as the portions of Plaintiff's Contempt Application that rely on and cite from the Thomas Frost Declaration and attached exhibits. "[A] district court should be wary of issuing an injunction based solely upon allegations and conclusory affidavits submitted by plaintiff." *Atari Games Corp. v. Nintendo of America, Inc*., 897 F.2d 1572, 1575 (Fed. Cir. 1990); *see also*

*New England Braiding Co. v. A.W. Chesterton Co.*, 970 F.2d 878, 882 n.4 (Fed. Cir. 1992) ("the trial court, in ruling upon a motion for a preliminary injunction, 'must be cognizant of the substantive evidentiary standard of proof that would apply at the trial on the merits'"); *Abbott Lab'ys v. Sandoz, Inc.*, 544 F.3d 1341, 1364 (Fed. Cir. 2008) ("Supreme Court precedent is clear in stating that the same burdens and standards of proof apply in deciding the merits for preliminary injunction purposes, as in deciding the same questions upon full litigation.").

Striking Thomas Frost's unreliable, self-serving declaration and attached exhibits, Plaintiff's moving papers are laid bare as an unprincipled cash grab of counsel's design.

### 3.    The Balance of Equities are Overwhelmingly in Favor of Responding Parties

The balance of equities tips decidedly in favor of Responding Parties, warranting a denial of Plaintiff's requested preliminary injunction. Granting the preliminary injunction would impose significant and unjustified hardships on Responding Parties, while any potential harm to Plaintiff—to the extent that any such harm exists—is merely speculative and compensable through monetary remedies.

Here, imposing an asset freeze would paralyze Responding Parties' legitimate business operations, threatening their financial viability and causing irreparable harm to their business relationships and reputation. For instance, freezing business assets would hamstring Responding Parties' ability to meet rent and payroll, pay vendors and suppliers, fulfill contractual obligations, and maintain daily operations. Lakhany Decl. ¶¶ 17–18. Notably, this outcome would result in substantial harm to Responding Parties and *also* severely impact Responding Parties' employees and their families who rely on the income, customers, and other stakeholders who depend on their continued operations. *Id.* Additionally, the preliminary injunction's sweeping scope, which also seeks to freeze Responding Parties' personal assets, would inflict severe and unwarranted harm on their individual finances and jeopardize their ability to meet

essential personal obligations, including, but not limited to, mortgage payments and basic living costs. *Id.* Compounding the personal hardships the preliminary injunction would impose on Lakhany and Sattar, it would also disrupt the financial well-being of their families, who depend on them for stability and financial support. *Id.*

In contrast, Plaintiff's alleged harm is speculative and lacks credible evidence. There is no demonstrable risk that Responding Parties will dissipate assets to frustrate a potential court order. "A party seeking an asset freeze must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted." *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009). Here, the purported justifications for the asset freeze cited by Plaintiff are purely myth, as: (i) the claims of counterfeiting are unfounded, given that Responding Parties have only sold genuine, authorized products; (ii) routine business transactions with China are mischaracterized as illicit, when they are standard in the smoking-products industry; (iii) the accusations of trafficking in counterfeit goods through a nationwide network are mischaracterized, given that Responding Parties are not associated with any out-of-state distributors and do not sell counterfeit products; (iv) WeChat is a standard communication platform, not an attempt to conceal illicit activity; (v) there is no evidence of asset dissipation or movement between entities to evade the Court's orders, as all corporate structuring is legitimate and business-driven; (vi) Plaintiff's claim of continuous violations of court orders is disingenuous, as Responding Parties were in compliance with the Court's directives and any misunderstandings—to the extent they occurred—were in good faith; and (vii) Plaintiff's allegations of bad faith litigation tactics, including the replacement of counsel, distort Responding Parties' insurance coverage issues and efforts to navigate this complex matter. *See* Lakhany Decl. ¶¶ 2, 3, 4, 8, 14, 15, 19–21.

Furthermore, the requested injunction is overbroad and extends beyond what is necessary to prevent the alleged harm. It seeks to freeze assets unrelated to the claims at issue and which are essential for Responding Parties' lawful operations. *See*

*Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1119 (9th Cir. 2009) ("because "[i]njunctive relief ... must be tailored to remedy the specific harm alleged, [a]n overbroad injunction is an abuse of discretion."") (citation and internal quotations omitted). Moreover, it appears that Plaintiff's counsel is, yet again, leveraging this Court and its resources to extract additional attorneys' fees and harass Responding Parties, which further tip the scales of equity against granting the preliminary injunction. The courts should not be used as a tool for harassment or to impose undue burdens on opposing parties—which is *exactly* the circumstance here. *See Frontera Res. Corp. v. Hope, No.* 19-CV-01996-RS, 2019 WL 2410513, at *3 (N.D. Cal. June 7, 2019) (evidence of unclean hands may show a lack of entitlement to the balance of the equities). As such, granting an injunction here would reward Plaintiff's and its counsel's tactical overreaching while simultaneously imposing significant and unwarranted hardship on Responding Parties with little to no effect to Plaintiff. Therefore, the balance of equities tips overwhelmingly in favor of Responding Parties and merits a denial of the preliminary injunction.

### 4.    Granting a Preliminary Injunction in this Circumstance is Against the Public Interest

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312). Allowing businesses to operate without unwarranted interference promotes economic stability and fairness in the marketplace. *See Gerber Plumbing Fixtures, LLC v. Amerifreight, Inc.*, No. 2:15-CV-04146-ODW, 2015 WL 3824149, at *4 (C.D. Cal. June 18, 2015) (noting that in a private dispute between two companies, there was no public interest at issue, but "[i]f anything, the public has an interest in the continued flow of commerce"). Here, granting a preliminary injunction would disrupt the normal operations of Responding Parties' legitimate business, causing undue harm to their employees, customers, and suppliers who rely on the ongoing flow of

their goods. As such, the public interest is best served by ensuring that businesses are not hindered by speculative and unfounded claims, especially where there is no credible evidence of wrongdoing or imminent harm. Accordingly, a denial of Plaintiff's request for a preliminary injunction would strongly favor the public interest.

**B.    Alternatively, the Court Should Require Plaintiff to Post a Bond of No Less Than $10 Million**

Under the Federal Rules of Civil Procedure, "[t]he court may issue a preliminary injunction or temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed.R.Civ.P. 65(c); *see also Ware v. Bayview Loan Servicing, LLC* 2013 WL 5308303, at *2 (S.D. Cal., Sept. 18, 2013, No. 13-CV-1310 JLS NLS). Although the court may, in its discretion, decline to order the payment of a bond (despite the seemingly mandatory nature of Rule 65(c)'s language), *Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011), this Court has no reason to excuse the failure to pay a bond where Plaintiff's substantive likelihood of success is de minimis to nil.

The failure to pay a bond required by court order has been found to constitute changed circumstances meriting the dissolution of a preliminary injunction. *See, e.g., Castillo v. Skoba,* No. 10CV1838 BTM, 2011 WL 92991 (S.D.Cal. Jan.7, 2011) (Moskowitz, J.). Here, as noted in the Motion to Strike and Objections, AKF's assertion that a bond was paid in the *AKF v. Green Buddha* litigation has no bearing on the bond requirement before *this* Court. Any bond posted in related action *AKF v. Green Buddha* does not collateralize an injunction affecting Lakhany, Jumani, ST, or Smoke Tokes, or the seize of their personal bank accounts without due process. (*Contra* Thomas Frost Declaration at ¶ 6 & Attached Exhibit 2.) Counsel's proffer of this bond in the *Green Buddha* action in support of Plaintiff's application for a TRO against three *non-parties* deceptively suggests this bond satisfied Federal Rule of

1  Civil Procedure 65(c)'s bond requirement of the posting of a bond as condition

2  precedent to obtaining a TRO. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395

3  U.S. 100, 112 (1969) ("[A] nonparty with notice cannot be held in contempt until

4  shown to be in concert or participation. It was error to enter the injunction against [a

5  nonparty], without having made this determination in a proceeding to which [the

6  nonparty] was a party."). But it does not, and this Court should require a bond of $10

7  million as required by FRCP 65(c), provided the Court decides to issue the

8  preliminary injunction, which it should not. *See* Lakhany Decl. ¶ 21.

9  **V.  CONCLUSION**

10      For the foregoing reasons, Responding Parties respectfully request that the

11  Court deny Plaintiff's request for a preliminary injunction.

12

13  DATED: September 13, 2024      FROST LLP

14

15

16      By:     /s/ Christopher Frost

17      CHRISTOPHER FROST
    DAVID TIRATURYAN

18      Attorneys for Responding Parties

19      Raheel Lakhany, Shafaq Sattar,
    ST & Company, LLC

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 11-6.1</u>

The undersigned, counsel of record for Responding Parties, certifies that this brief contains 5,673 words, which complies with the word limit of L.R. 11-6.1.

DATED: September 13, 2024

By:     /s/ Christopher Frost
       CHRISTOPHER FROST